# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD VICTOR ESCALON,<br><br>         Petitioner,<br><br>    v.<br><br>K.V.S.P. WARDEN,<br><br>         Respondent. | Case No. 1:19-cv-00722-LJO-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS<br><br>(ECF No. 17) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On August 5, 2014, Petitioner was convicted after a jury trial in the Fresno County Superior Court of first-degree murder. The jury also found that Petitioner personally used a deadly weapon. (2 CT[1] 580). Petitioner was sentenced to an imprisonment term of thirty-one years to life. (2 CT 586–87, 590). On January 8, 2018, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Escalon, No. F070024, 2018 WL 316846 (Cal. Ct. App. Jan. 8, 2018). On January 26, 2018, the California Court of Appeal, Fifth

///

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on October 21, 2019. (ECF No. 19).

1  Appellate District denied Petitioner's petition for rehearing. (LD[2] 24). On April 25, 2018, the

2  California denied Petitioner's petition for review. (LD 25).

3      On May 18, 2019,[3] Petitioner constructively filed a federal petition for writ of habeas

4  corpus challenging his 2014 Fresno County conviction for first-degree murder on the grounds

5  that: (1) the trial court prejudicially erred by failing to sua sponte instruct on the lesser-included

6  offense of attempted murder; and (2) the appellate court erred in affirming the judgment with

7  respect to the lesser-included offense instruction. (ECF No. 1). On May 28, 2019, the Court

8  ordered Respondent to file a response to the petition. (ECF No. 6).

9      Despite no order to show cause having been issued, on July 15, 2019, Petitioner filed a

10  document entitled "Memorandum of Points and Authorities in Support of Answer to Order to

11  Show Cause." (ECF No. 11). Therein, Petitioner included the following additional claims for

12  habeas relief: (1) erroneous admission of prejudicial photographs; (2) prosecutorial misconduct;

13  (3) erroneous admission of prejudicial predisposition evidence; (4) ineffective assistance of

14  counsel; and (5) cumulative effects of errors. (ECF No. 11 at 2–3).[4]

15      On September 10, 2019, the Court discharged the order to respond to the original petition

16  and granted Petitioner leave to file a first amended petition that includes all his claims for habeas

17  relief. (ECF No. 16). On September 16, 2019, Petitioner constructively filed the First Amended

18  Petition ("FAP"). (ECF No. 17). On October 10, 2019, the Court construed the "Memorandum of

19  Points and Authorities in Support of Answer to Order to Show Cause" as a memorandum of

20  points and authorities in support of the FAP and ordered Respondent to file a response to the

21  FAP and memorandum. (ECF No. 18). Respondent filed an answer, and Petitioner filed a

22  traverse. (ECF Nos. 20, 21).

23  ///

24  ///

25  ---
[2] "LD" refers to the documents lodged by Respondent on October 21, 2019. (ECF No. 19).

26  [3] Pursuant to the mailbox rule, a pro se prisoner's habeas petition is filed "at the time . . . [it is] delivered . . . to the prison authorities for forwarding to the court clerk." Hernandez v. Spearman, 764 F.3d 1071, 1074 (9th Cir. 2014)

27  (alteration in original) (internal quotation marks omitted) (quoting Houston v. Lack, 487 U.S. 266, 276 (1988). The mailbox rule applies to both federal and state habeas petitions. Campbell v. Henry, 614 F.3d 1056, 1059 (9th Cir. 2010).

28  [4] Page numbers refer to the ECF page numbers stamped at the top of the page.

# II.

## STATEMENT OF FACTS[5]

### I. A Synopsis Of The Relevant Trial Facts.

It is undisputed that appellants killed Zuniga on January 28, 2011, in a residence in Fresno County. In the basement, Gonzalez struck Zuniga's head with a wooden baseball bat and Escalon cut Zuniga with a knife, severing his aorta. Zuniga had been unarmed. Two witnesses, Delilah Luna and A.F.,[6] observed the incident.

When these events occurred, Luna was "seeing" Gonzalez, but they had ended an eight-year relationship. A.F. was a teenager who had just met Luna and Gonzalez the day before Zuniga's homicide.

It is undisputed that appellants, Luna, A.F., and Zuniga all smoked methamphetamine on the day before this crime. They each smoked again on the day Zuniga was killed.

#### A. The motive to kill.

The prosecution and the defense disputed why appellants were in the basement with Zuniga in the moments leading to his death. The prosecutor argued that appellants were involved in a fraudulent check-cashing scheme, and they killed Zuniga because he tried to steal from them. The parties presented substantial trial evidence regarding this issue. We need not, however, summarize all of those facts.

It is undisputed that Zuniga, in the early morning hours of January 28, 2011, had deposited a forged check into Escalon's bank account using Escalon's ATM card. The forged check belonged to Mary Ann Mitchell, the residence's owner. Zuniga had attempted to withdraw funds from Escalon's bank account, but the bank froze the account.

It is undisputed that, later that same day, appellants drove to the bank. Luna, A.F., and Escalon's wife, Moneca Alcala,[7] accompanied them. Appellants learned that Escalon's bank account was frozen because of Zuniga's activity. According to A.F.'s and Luna's independent statements to police, appellants then argued about money and they believed that Zuniga owed them money. Appellants drove back to the residence to confront Zuniga. According to appellants, however, they simply wanted to talk to Zuniga because Gonzalez wanted both Escalon and Zuniga to leave the residence. Gonzalez wanted Escalon to speak with Zuniga because "they were the ones trying to cash [Mitchell's] checks."

It is undisputed that appellants went from the bank to the residence where they encountered Zuniga, and the killing occurred. Luna testified that Gonzalez, who drove, did not drop her or A.F. off at another location as planned. Instead, he drove back to the residence a little too fast.

---

[5] The Court relies on the California Court of Appeal's January 8, 2018 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[6] A.F. was 15 years old when Zuniga's homicide occurred.

[7] Alcala did not testify in this trial.

## B. Alma Barragan and Maggie Meza hear and see part of the murder.

Two women, Alma Barragan and Margarita (Maggie) Meza, were sharing a room at the residence on the day of Zuniga's murder. Barragan saw appellants get out of their vehicle when they returned to the residence. She did not see Gonzalez carrying a bat. Meza heard people returning to the residence. According to Meza, Escalon's wife came into their room and warned them to stay there because "something was going to happen." Meza then heard yelling and a girl scream "no" or "stop" or something similar.[8] Barragan also testified that she heard yelling.

Barragan looked out the door and she saw Zuniga running. He fell in the kitchen near a back door. Barragan closed her door. Later, she looked out her door and saw Zuniga lying on the kitchen floor. Appellants were pacing in the kitchen. Gonzalez told Zuniga to get up. Gonzalez held a bat and Escalon held a knife. Escalon threw very hot water on him, but Zuniga did not move. Zuniga was lying in a pool of his own blood. Appellants hugged each other and appeared happy.

At some unknown time, A.F. came into Barragan's room with smeared blood on her arm. A.F. look scared. She said "they" confronted Zuniga downstairs "and then they attacked him." They hit Zuniga's head, and "he was trying to get away." Zuniga pushed them and tried to run upstairs, and "they ran behind him." Zuniga was stabbed after he started fighting back and was trying to get away. A.F. kept saying something like "they got him" or "they hit him."

## C. The events in the basement.

The prosecution's evidence is in conflict regarding when appellants were first armed. A.F. provided inconsistent statements regarding the circumstances of the killing.[9] Two or three days after this murder, A.F. told police that appellants approached Zuniga while armed, and they immediately attacked him because of money. Gonzalez struck the front of Zuniga's head with a wooden bat. Zuniga said something like "what the fuck?" Escalon then stabbed Zuniga around the stomach with a silver bladed folding knife. Zuniga fled up the basement stairs to the kitchen, where he collapsed. Appellants continued to hit Zuniga in the kitchen.

At trial, however, A.F. provided different accounts. She initially testified that Zuniga fought with appellants in the basement and Gonzalez struck Zuniga's head during the fight. After being refreshed by her statements to police, A.F. agreed that she told the police the truth and she told police that appellants were armed going down into the basement. They argued with Zuniga, and Zuniga said he did not have the money. A.F. testified that Gonzalez struck Zuniga over the head with the baseball bat and Escalon stabbed him. She could not remember where Zuniga was stabbed on his body.

---

[8] Meza initially testified that they heard loud noises and *then* Escalon's wife came into their room. After further questioning by the prosecutor, Meza agreed that she heard yelling *after* Escalon's wife warned them. Escalon argues that Meza's testimony was unreliable, contending the prosecutor led her. No objections were lodged in the trial court regarding this examination. After reading Meza's testimony, we disagree that this evidence is unreliable.

[9] During her statements to police, A.F. made other claims which became the subject of much examination and argument at trial. For instance, she initially claimed that Luna had kidnapped her and she had been sexually assaulted at the residence. However, during both her police interview and at trial, A.F. eventually admitted that she had lied to police about being abducted. At trial, she did not claim that she had been sexually assaulted at the residence.

Later at trial, however, A.F. testified that she saw appellants holding an aluminum bat and a silver knife in the vehicle on the way back to the residence. She claimed that they carried these weapons into the residence, but she later admitted that she did not remember.[10] A.F. also testified that the three men fought in the basement for about 30 minutes, before suggesting that was the length of time she was in the basement. She also stated that Zuniga was first stabbed in the neck and then hit multiple times with the bat. At trial, A.F. admitted multiple times that her memory of the events was poor.

Based on Luna's statements to police and trial testimony, appellants were not armed when they began arguing with Zuniga.[11] Zuniga initiated a fight, and a fistfight occurred in the basement involving all three men.

According to Luna, Gonzalez struck Zuniga's forehead with a baseball bat, not during the fight, but when Zuniga was trying to show him a piece of paper. The bat had been in the basement. After being struck, Zuniga said, "What the fuck?" Luna told both the police and the jury that the incident was Gonzalez's fault, and Zuniga did not pose a threat when he was struck. Zuniga fled up the stairs. Gonzalez yelled for Escalon to get Zuniga. Luna next saw Zuniga lying on the kitchen floor unresponsive. In the kitchen, Escalon and Gonzalez continued to strike Zuniga's body. She never saw Escalon hold a knife or stab Zuniga. However, she heard Escalon say, "I done him[.] I done him."

### D. Appellants' efforts to hide the evidence.

The prosecution's evidence established that appellants tried to hide evidence of this crime. Using cut coaxial cables, appellants fashioned handles around Zuniga's body. They both moved the corpse to Zuniga's SUV, which Escalon drove away.

Gonzalez ordered Luna to clean the basement. Luna and A.F., along with Escalon's wife, cleaned blood from the basement, the stairway, and the kitchen. Luna testified at trial that she did so because she was afraid of Gonzalez and she feared for her life. A.F. testified that she cleaned the basement because Luna asked her to do so, and A.F. was scared.

While they cleaned the basement, Gonzalez ripped away the carpeting that covered the basement stairs. A friend of Luna's, Cesar Quezada, came to the residence while everyone was cleaning. The carpet and bat where loaded into Quezada's vehicle and driven away.

### E. The women were held hostage.

With the exception of Escalon's wife, who did not testify at trial, the women in the residence all testified or told police that they were not allowed to leave the residence after the killing. Luna overheard appellants arguing about whether or not they should kill the witnesses. Gonzalez told Barragan "we're going to have to get rid of [Meza]" who saw or knew too much. At some point, Gonzalez asked Meza for her cell phone, which she refused to give him.

---

[10] At trial, the jury learned that A.F. never told police that she saw appellants with weapons in the vehicle as they drove back to the residence.

[11] With her attorney present, Luna spoke with police a little over one month after Zuniga's murder. At trial, she agreed that she delayed contacting police because she was hoping to work out a deal for herself. During her police interview, she discussed a pending probation problem. Luna testified at the preliminary hearing under a grant of immunity, but she did not have any immunity for her trial testimony.

Sometime during that day, Gonzalez told Meza that a fight had occurred but Zuniga "was okay." Gonzalez told Barragan that Zuniga had been stealing, but he was not going to do that again. To leave, Barragan suggested that she could drive Gonzalez to get more methamphetamine. Gonzalez agreed. Barragan and Meza drove Gonzalez to a house in Clovis. Shortly after Gonzalez went inside, Barragan and Meza drove away, leaving him there. Sometime later that day, Gonzalez returned to the residence alone.

**F. Law enforcement's investigation.**

On approximately February 1, 2011, both A.F. and Barragan independently informed police about Zuniga's homicide, and both were interviewed. That evening, police arrested Gonzalez at the residence. The following morning, police interviewed Gonzalez, who generally denied any knowledge of Zuniga's death or his whereabouts.[12] At trial, a detective testified that he did not observe any injuries on Gonzalez's face during that interview.

When police searched the residence, they found pieces of severed coaxial cable, and evidence of recent cleaning, including the odor of bleach. A broken-handled kitchen knife was found in the trash. The knife blade was approximately three inches in length. Police found blood spatter in several locations in the basement. DNA testing confirmed it was Zuniga's blood.

By the side of a road away from the residence, police recovered pieces of the carpet that had been ripped from the basement. A baseball bat was inside the carpet, and it had blood on it. Zuniga's DNA was the "major profile" of genetic material found on the bat. Police arrested Escalon on February 2, 2011.

**G. Zuniga's charred remains are found.**

On February 2, 2011, police located Zuniga's SUV in a rural orchard. It had been burned and Zuniga's charred body was found inside. Zuniga's corpse had been wrapped with coaxial cable. A color photo, People's exhibit 16, shows Zuniga's charred corpse in the back of his SUV.

An autopsy revealed a depressed fracture on the right side of Zuniga's forehead consistent with blunt force trauma that could have been caused by a baseball bat, but not a fist. A color photo, People's exhibit 23, shows Zuniga's scorched skull and the obvious depressed fracture.

The cause of death was a perforation of Zuniga's aorta. Because of the burning to Zuniga's corpse, the pathologist could not confirm a stab wound from an external exam. A color photo, People's exhibit 21, shows Zuniga's charred torso (absent arms) lying on the exam table. The pathologist opined that the fatal penetrating wound was caused from a blade approximately three inches long, and the wound entered from the front. The wound was caused by a moderate to severe degree of force. Zuniga could have survived for three to seven minutes after the aorta perforation, and he could have traveled five to 15 yards before dying. The pathologist could not determine which occurred first: the blow to Zuniga's head or his fatal stab wound.

---

[12] A more detailed summary of Gonzalez's police interview is in section I of the Discussion, below.

Because of the corpse's condition, the pathologist could not identify any other stab wounds, bruising, or other injuries. The autopsy, however, revealed a very significant amount of methamphetamine in Zuniga's system. The pathologist explained at trial that ingestion of this drug can cause a person to have inappropriate and aggressive behavior.

**II. Relevant Defense Facts.**

Both Gonzalez and Escalon testified at trial. They both admitted to smoking methamphetamine in the days leading up to this homicide, and they both used methamphetamine on the morning of the homicide. Gonzalez admitted at trial that he was very high when these events occurred. Escalon admitted that he was high when he burned Zuniga's SUV.

Appellants testified that they feared Zuniga, who had a reputation for violence. Zuniga claimed to have killed a lot of people as a marine sniper. He had a temper, and he was often armed with a nine-millimeter handgun, which he had displayed at the residence. Appellants provided the jury with first-hand accounts wherein they observed Zuniga brutally beating and robbing various victims.

Another defense witness, Ruben Garcia, knew Zuniga from prison and Garcia confirmed that Zuniga had a reputation for violence. Zuniga was intimidating, used his body weight, and he often boasted of violent criminal exploits.[13] Garcia described him as "a beast in nature." Zuniga could switch his demeanor quickly and make something "an all-in situation." Garcia believed that Zuniga had no morals or values, and Zuniga was prepared to lie, cheat and steal to get what he wanted. In 2008, Garcia warned Gonzalez about Zuniga's character for "shadiness" and relayed an incident where Zuniga had stabbed someone.

At trial, appellants admitted that they went down into the basement on January 28, 2011, to speak with Zuniga. They denied any plans to assault or kill him. Instead, they were going to tell Zuniga that he had to leave the residence. Escalon testified that Zuniga was "high as hell" that day and Escalon was scared to speak with him.

According to appellants, Escalon told Zuniga that he had to leave the residence. Zuniga jumped up and said something like, "You fucking bitch. You told him about the check?" Zuniga then attacked Gonzalez. Zuniga overpowered Gonzalez and bloodied his face.

Gonzalez testified that Zuniga repeatedly struck him and Gonzalez felt himself blacking out. Fearing for his life, Gonzalez grabbed a bat. Gonzalez believed that Zuniga might retrieve his gun. Gonzalez struck Zuniga once with the bat when Zuniga charged at him. Gonzalez claimed that he did not strike Zuniga's head where the fracture occurred. Instead, Zuniga partially blocked the blow and the bat struck the side of his head. Gonzalez did not think he struck Zuniga hard with the bat, claiming he "bunted" him.

According to appellants, Zuniga then attacked Escalon, punching him. Escalon saw that Zuniga was reaching for a knife on a desk. Escalon, however, grabbed the knife first. Zuniga punched Escalon, who feared that Zuniga would take the knife from him. Escalon swung the knife one time to defend himself because he was afraid for his life. Zuniga ran up the stairs out of the basement.

---

[13] Based on his DMV information, Zuniga was five feet nine inches tall, and weighed approximately 200 pounds.

Appellants both testified that they followed Zuniga up the stairs. They claimed that they did so over a concern that he might retrieve his gun. They found him lying on the kitchen floor, unresponsive. They believed he was pretending. Escalon threw hot water on him. Appellants became panicked and scared. Escalon threw the knife into the kitchen sink. Appellants denied striking Zuniga while he lay on the kitchen floor.

According to Escalon, it was Luna who suggested that they should dispose of Zuniga's corpse or burn it. She and Escalon used a tarp and coaxial cables to move Zuniga's body to his SUV. They drove it out into a remote area and started it burning. Escalon testified that Gonzalez, who had been down in the basement, was not involved in removing Zuniga's corpse.

Gonzalez denied cleaning the residence or removing the carpet. He went down into the basement to look for Zuniga's gun and to fix his cell phone, which had been damaged during the fight. He left the residence with Barragan and Meza, and he went to a house in Clovis. He returned to the residence about seven or eight hours later. When he returned, the stairway carpet was gone. According to Gonzalez, Luna said that she and Quezada had disposed of it. Appellants denied talking about killing witnesses or preventing anyone from leaving the residence.

Escalon, 2018 WL 316846, at *1–5 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

///

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The

word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. <u>Id.</u> If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018); <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at

99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A.  Instructional Error

In his first claim for relief, Petitioner asserts that the trial court erred in failing to sua sponte instruct the jury on the lesser-included offense of attempted murder. (ECF No. 17 at 4). Respondent argues that this claim presents no federal question. (ECF No. 20 at 9).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

///

///

11

In denying Petitioner's instructional error claim, the California Court of Appeal stated:

**III. The Trial Court Had No Duty To Instruct On Attempted Murder.**

Escalon contends that the trial court erred in failing to instruct on attempted murder. He asserts that Gonzalez could have independently attempted to kill Zuniga but he (Escalon) fatally stabbed Zuniga based on self-defense, heat of passion or sudden quarrel separate and apart from Gonzalez's intent and actions. He argues that the record does not establish any plan to kill Zuniga, and Gonzalez attacked Zuniga spontaneously without Escalon's involvement. Gonzalez joins the claim of instructional error. We disagree.

A trial court is required to instruct the jury on a lesser included offense only if there is substantial evidence that absolves the defendant from guilt of the greater offense but not the lesser. (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) Substantial evidence in this regard has been defined as evidence a reasonable jury could find persuasive. (*Ibid.*) In reviewing this claim, we are to view the evidence in the light most favorable to appellant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Here, when viewing the evidence in the light most favorable to appellants, substantial evidence does not exist that established Gonzalez's guilt for attempted murder but not for murder. It is undisputed that appellants discussed confronting Zuniga and they both walked down together into the basement where Zuniga was fatally injured. Gonzalez struck Zuniga's head with a baseball bat and Escalon stabbed him. Zuniga was unarmed during this encounter. For purposes of this analysis, we will assume that appellants injured Zuniga after Zuniga began to fight them. However, when Zuniga fled from the basement, Gonzalez yelled for Escalon to get Zuniga, and appellants chased after him to the kitchen where they found him unresponsive. Steps were taken to hide evidence of this crime, including Escalon burning Zuniga's corpse. Assuming for this analysis that Gonzalez had no involvement in attempting to conceal or destroy evidence, he still lied to police mere days after this killing, claiming he had no knowledge of any incident involving Zuniga at the residence.

We reject Escalon's claims that substantial evidence shows that appellants acted independently vis-à-vis Zuniga's death. The trial evidence strongly suggests that appellants aided and abetted each other. Based on this record, a reasonable jury would not find persuasive evidence that absolved Gonzalez from guilt of murder but not attempted murder. As such, the trial court did not have a duty to instruct the jury regarding the lesser offense of attempted murder and this claim fails.

Escalon, 2018 WL 316846, at *10–11.

In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held that due process is violated in a *capital* case "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627. Beck expressly declined to decide whether due process would require giving a lesser included offense instruction in non-capital cases. Id. at 638 n.14. The Ninth Circuit has declined to extend Beck to non-capital cases, and "[u]nder the law of this circuit, the

failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (citing Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995)).

Therefore, Petitioner is not entitled to federal habeas relief regarding his claim that the trial court prejudicially erred by failing to sua sponte instruct the jury on a lesser-included offense of attempted murder.[14]

## B. Timeliness of Remaining Claims

Respondent argues that Petitioner's claims regarding prosecutorial misconduct and the erroneous admission of prejudicial photographs and predisposition evidence are untimely. (ECF No. 20 at 11–15). Ordinarily procedural bar issues are resolved first,[15] but courts have recognized that "[p]rocedural bar issues are not infrequently more complex than the merits issues . . . so it may well make sense in some instances to proceed to the merits if the result will be the same." Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)). Accordingly, the Court will proceed to the merits of these claims.

## C. Admission of Photographs and Predisposition Evidence

1. Photographs

In his second claim for relief, Petitioner asserts that the trial court erroneously admitted prejudicial photographs from the victim's autopsy. (ECF No. 11 at 66–95; ECF No. 17 at 4). Respondent argues that the claim presents no federal question. (ECF No. 20 at 10). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

---

[14] Although "the *refusal* by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim," Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (emphasis added), neither Petitioner nor Petitioner's codefendant requested instructions on the lesser-included offense of attempted murder. (2 CT 371–81, 500–69; 2 RT 310–21; 10 RT 2706–14).

[15] "[T]he AEDPA statute of limitations defense . . . is not jurisdictional." Holland v. Florida, 560 U.S. 631, 645 (2010) (internal quotation marks omitted) (quoting Day v. McDonough, 547 U.S. 198, 205 (2006)).

In denying Petitioner's claim challenging the admission of the autopsy photographs, the California Court of Appeal stated:

**IV. The Trial Court Did Not Abuse Its Discretion Regarding The Photographs.**

Escalon asserts that the trial court abused its discretion in permitting introduction of three color photographs at trial: (1) People's exhibit 16 (showing Zuniga's burnt corpse in the back of his burned-out SUV); (2) People's exhibit 21 (showing Zuniga's burnt corpse, absent arms, lying on the autopsy table); and (3) People's exhibit 23 (showing Zuniga's charred skull). Escalon contends that the prejudicial effect of these photos greatly outweighed their probative value. Gonzalez joins this claim.

**A. Standard of review.**

A trial court enjoys broad discretion to admit photographs of a criminal victim when a defendant claims that the photos are unduly gruesome or inflammatory. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1272.) Unless the probative value of such photos is clearly outweighed by their prejudicial effect, we will not disturb the trial court's exercise of that discretion. (*Ibid.*) An abuse of discretion requires a showing that the trial court's decision was arbitrary, capricious or patently absurd resulting in a manifest miscarriage of justice. (*People v. Rodrigues, supra,* 8 Cal.4th at pp. 1124–1125.)

**B. Analysis.**

Appellants argue that these photos were not probative in this trial because they were neither relevant, material nor necessary. They contend that the trial court relied upon the prosecutor's erroneous representations regarding their probative value, and they claim that the prejudicial effect required exclusion. We find these contentions unpersuasive.

"Whether the trial court erred in admitting into evidence the challenged photographs of the murder victims depends upon two factors: (1) whether the photographs were relevant, and (2) whether the trial court abused its discretion in determining that the probative value of each photograph outweighed its prejudicial effect. [Citation.]" (*People v. Ramirez* (2006) 39 Cal.4th 398, 453.)

Our Supreme Court has consistently upheld the introduction of autopsy photos showing how a victim was wounded. (*People v. Gonzales, supra,* 54 Cal.4th at p. 1272.) Photos of the victim's wounds are relevant to support the prosecution's theory of how the crime occurred. (*People v. Pride* (1992) 3 Cal.4th 195, 243.) Even gruesome photos may be admitted if highly relevant to the trial issues or to clarify the testimony of the medical examiner. (*People v. Gonzales, supra,* 54 Cal.4th at p. 1272.) Our Supreme Court has noted that photographs of murder victims are always disturbing, but gruesome photos can accurately portray the shocking nature of the charged crime. (*Ibid.*) "The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*Ibid.*)

A prosecutor is not required to prove these details of a victim's injuries only from live testimony. (*People v. Pride*, *supra*, 3 Cal.4th at p. 243.) A jury is entitled to view the physical details of the scene or the victim. (*Ibid.*) Our Supreme Court has often rejected any argument that photographs of a murder victim should be excluded as cumulative even though testimony has established the same facts depicted in the images. (*People v. Price* (1991) 1 Cal.4th 324, 441.)

Here, prior to trial, a relatively lengthy hearing occurred wherein the parties argued these issues. In ruling that these disputed photos were admissible, the trial court noted that the jury was entitled to see evidence of the crime even though the images were distressing and upsetting. In exercising its discretion, the trial court excluded from evidence three other photos depicting Zuniga's charred corpse. The excluded photos also showed the body in the burned-out SUV and on an exam table. One excluded photo, People's exhibit 17, clearly shows Zuniga's blackened intestines. The record reflects that the experienced trial judge was well aware of his duty to weigh prejudice versus probative value, and he did so.

We have independently reviewed the disputed photos. Exhibits 16 and 21 show the condition of Zuniga's body in his burned-out SUV and on the autopsy table. Exhibit 23 clearly shows the traumatic head injury that Zuniga suffered. Although these photos are disturbing, they are not unnecessarily so and they simply depict what occurred without sensationalizing the crime. Any revulsion they create is attributable to the acts done and not to the photographs. (*People v. Cage* (2015) 62 Cal.4th 256, 284; see also *People v. Anderson* (2001) 25 Cal.4th 543, 592 ["[T]he admitted photos are not offensive beyond the events and conditions they portray."].)

We reject appellants' claim that the trial court abused its discretion based on alleged erroneous offers of proof at the hearing. Regarding People's exhibit 21, the prosecutor had argued that this photo was relevant to corroborate the pathologist's expected trial testimony that it depicted a stab wound to the heart. At trial, however, the pathologist explained that it was difficult to appreciate a stab wound in this photo based on the body's condition. Likewise, regarding People's exhibit 23, the prosecutor had argued that the jury should see the injury to Zuniga's skull, noting it was possible the pathologist might not commit to the cause of this injury because of possible thermal heat fracturing to the skull. At trial, however, the pathologist confirmed that the depressed facture to Zuniga's skull was caused by blunt force trauma consistent with a bat. The pathologist conclusively stated that the blunt force injury was not the result of a heat fracture. Regardless of the prosecutor's pretrial offers of proof, we disagree that the trial court abused its discretion. These photos were highly probative in this case.

With these disputed photos, the jurors could see for themselves the blow to Zuniga's head, and the images assisted the jury in understanding the pathologist's testimony. The photos clarified the testimony of the various witnesses regarding the location and condition of Zuniga's body. Because the photos assisted the jury in understanding and evaluating the trial testimony, we reject any argument that the photos were not necessary, they were cumulative, or they lacked sufficient materiality. "The photographs were not made inadmissible by the prosecutor's ability to prove motive, intent, and cause of death through other evidence. [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 862.)

Based on this record, we will not disturb the trial court's exercise of its discretion because the probative value of these photos is not clearly outweighed by its prejudicial effect. The trial court's decision to admit these photos was not

arbitrary, capricious or patently absurd resulting in a manifest miscarriage of justice. An abuse of discretion is not present. Accordingly, we reject this claim.

Escalon, 2018 WL 316846, at *11–12.

The pertinent question on federal habeas review is whether the state proceedings satisfied due process, and "[t]he admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal quotation marks omitted) (quoting Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995)). In Holley, the petitioner was charged with multiple felony counts of lewd and lascivious acts on a child under fourteen and challenged the trial court's admission of a lewd matchbook and several sexually explicit magazines seized from the petitioner's bedroom. 568 F.3d at 1096. The Ninth Circuit denied habeas relief because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ [of habeas corpus]." Id. at 1101. "Absent such 'clearly established Federal law,'" the Ninth Circuit could not "conclude that the state court's ruling was an 'unreasonable application.'" Id. (quoting Carey v. Musladin, 549 U.S. 70, 77 (2006)).

This Court is bound by the Ninth Circuit's decision in Holley. Although circuit caselaw is not governing law under AEDPA, the Court must follow Ninth Circuit precedent that has determined what federal law is clearly established. Byrd v. Lewis, 566 F.3d 855, 860 n.5 (9th Cir. 2009). Further, Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc)

Although Petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process," Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996), the admission of evidence provides a basis for federal habeas relief if "it rendered the trial fundamentally unfair in violation of due process," Holley, 568 F.3d at 1101. However, as noted above, there is no Supreme Court holding that establishes the fundamental unfairness of admitting irrelevant or overtly prejudicial evidence. Holley, 568 F.3d at 1101. Thus, the

California Court of Appeal's denial of relief with respect to the admission of the autopsy photographs was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

2. Predisposition Evidence

In his fourth claim for relief, Petitioner asserts that the trial court erroneously admitted prejudicial predisposition evidence. (ECF No. 11 at 97; ECF No. 17 at 5). Respondent argues that the claim should be dismissed because: the FAP and memorandum lack sufficient factual content to state a colorable federal claim; the claim was not fairly presented to the California Supreme Court and thus, is unexhausted; and the claim does not present a federal question. (ECF No. 20 at 13–15).

On direct appeal, Petitioner joined his codefendant's argument that the trial court abused its discretion in admitting testimony regarding the codefendant's history of domestic violence. See Escalon, 2018 WL 316846, at *8. This claim was not raised in Petitioner's petition for review in the California Supreme Court, (LD 25), and thus is unexhausted. However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

The Court construes Petitioner's argument to be that the trial court erred in allowing a witness to testify on redirect examination about the abuse she had suffered from codefendant Gonzalez during their relationship, as Petitioner and codefendant argued on direct appeal. See Escalon, 2018 WL 316846, at *8; Allen v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) ("[T]he district court must construe pro se habeas filings liberally.").

///

A habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision. "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). In such cases, "we must rely on the jury to sort [the inferences] out in light of the court's instructions." Id. Admission of evidence violates due process "[o]nly if there are *no* permissible inferences the jury may draw" from it. Id.

Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005).

Here, the jury was specifically instructed:

The People presented evidence that the defendant, Marcos Gonzales, may have engaged in acts of domestic violence against the witness, Delilah Luna. You may consider this evidence only in evaluating Ms. Luna's credibility as a witness and to explain why she may have been afraid of Mr. Gonzales at the time of events leading to Mr. Zuniga's death and thereafter. You may not consider that evidence for any other purpose. You may not conclude from this evidence that the defendant, Mr. Gonzales, has a bad character or is disposed to commit crime.

(2 CT 535). The jury could draw permissible inferences from the domestic violence testimony regarding Ms. Luna's credibility and to explain why she may have been afraid at the time of the events at issue. The trial court explicitly instructed that the jury "may not conclude from this [domestic violence] evidence that the defendant, Mr. Gonzales, has a bad character or is disposed to commit crime," and a "jury is presumed to follow its instructions," Weeks v. Angelone, 528 U.S. 225, 234 (2000). As it is "perfectly clear" that Petitioner does not raise a colorable due process claim regarding the domestic violence testimony, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

**D. Prosecutorial Misconduct**

In his third claim for relief, Petitioner asserts prosecutorial misconduct. (ECF No. 17 at 5). In the memorandum of points and authorities, Petitioner specifies that the prosecutor committed misconduct in his opening statement by appealing to the emotions of the jury as he displayed a photograph of the victim while alive and a photograph of the victim's charred remains. (ECF No. 11 at 96). Respondent argues that this claim presents no federal question and is not properly exhausted. (ECF No. 20 at 11).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The claim was not in Petitioner's petition for review in the California Supreme Court, (LD 25), and thus is unexhausted. However,

1   pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits

2   "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim."

3   Cassett 406 F.3d at 624.

4       The Supreme Court "has recognized that prosecutorial misconduct may 'so infec[t] the

5   trial with unfairness as to make the resulting conviction a denial of due process.'" Greer v.

6   Miller, 483 U.S. 756, 765 (1987) (alteration in original) (quoting Donnelly v. DeChristoforo, 416

7   U.S. 637, 643 (1974)). "To constitute a due process violation, the prosecutorial misconduct must

8   be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Greer,

9   483 U.S. at 765 (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). It is not enough

10  that the prosecutor's conduct was "undesirable or even universally condemned" as "the

11  appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of

12  due process, and not the broad exercise of supervisory power.'" Darden v. Wainwright, 477 U.S.

13  168, 181 (1986) (quoting Donnelly, 416 U.S. at 642).

14      Although the comparison of the photographs of the victim while alive and after death

15  may have engendered sympathy for the victim, the prosecutor's conduct was not such that it "so

16  infected the trial with unfairness as to make the resulting conviction a denial of due process."

17  Donnelly, 416 U.S. at 643. See Smith v. Hawaii, 304 F. App'x 535, 536 (9th Cir. 2008) (finding

18  use of autopsy photographs of the infant-victim's body with extensive injuries in a PowerPoint

19  presentation during opening and closing arguments alone "could not have amounted

20  to prosecutorial misconduct"). Cf. Darden, 477 U.S. at 180–81, 180 nn.11–12 (holding petitioner

21  was not deprived of a fair trial even where prosecutor referred to the defendant as an "animal"

22  and stated, "I wish that I could see [the defendant] sitting here with no face, blown away by a

23  shotgun"). Further, the jury was instructed to "not let bias, sympathy, prejudice, or public

24  opinion influence your decision." (2 CT 503, 508). See Drayden v. White, 232 F.3d 704, 712–13

25  (9th Cir. 2000) (finding that the prosecutor's soliloquy delivered in the voice of the murder

26  victim—"as deplorable as it was"—did not violate due process given that the jury was instructed

27  attorney's statements were not evidence and they "must not be influenced by mere sentiment,

28  conjecture, sympathy, passion, prejudice, public opinion or public feeling").

As it is "perfectly clear" that Petitioner does not raise a colorable prosecutorial misconduct claim, the Court may deny this claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

## V.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the first amended petition for writ of habeas corpus (ECF No. 17) be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __**January 27, 2020**__                      _____

UNITED STATES MAGISTRATE JUDGE